v. Chronister, et al. Who's going first, Mr. Brown or Mr. Conahan? I am judging Mr. Brown. Okay, perfect. Okay, Mr. Brown, I think you're going to split your time eight and four with Mr. Conahan on the front end. Is that right? That sounds right, Judge. Okay, perfect. Whenever you're ready. Thank you, Judge. May it please the Court, Counsel. My name is Christopher Brown. I'm here on behalf of Sheriff Chad Chronister and Corporal Mark Clark. I'm here to discuss with the Court our legal concerns and issues with the District Court's finding on three issues, primarily Article III standing and two, denial of summary judgment for the Sheriff as to Count 1 and three, denial of summary judgment as to Corporal Clark as to Count 6. None of our arguments here today are intended to minimize the tragic events of February 7, 2014. But with that being said, I would also need to renew, and I know the Court has ruled, we do have a demonstrative aid. It has now been submitted to the Court. The arguments I made in our objection stand. It isn't a document that was part of the lower court record. It does have various... Wasn't a Google map in the record? A Google map is in the record. This Google map is not in the record, and it is substantially different than the ones that were in the record. So... Well, how is it different? The depiction of... I mean, a Google map from an aerial photograph is not going to change over time unless the topography has changed over time. What's depicted as occurring is the Florida State Fair in this particular map. What's depicted on the events in the record are not the Florida State Fair. It is different, Judge. That aside from... You're saying they're different Google maps? Correct. It's of the same thing taken at different times, and so there are different things depicted on the picture, Judge. When was the map that was in the record at the time, the ruling, taken? Clearly was taken at a time when the Florida State Fair wasn't in session. Was not in session. Not in session. This one, it is in session. Setting aside that, it has all kinds of... What difference does that make in terms of what the picture shows? Well... I mean, the only difference is that there are cars and people. The topography doesn't change, right? When you get and combine that with the text and labels that, again, I wasn't planning on arguing this more than our motion, our objection said, but the reality is there are some labels and texts that have been put on here that I would suggest are misleading and not accurate. Okay. Let's go through them. Okay. Approximate point of impact. Is that wrong? No, Judge. Okay. The place where... It may be faster if I point out what my concerns were, Judge. Okay. Tell me what's wrong. The midway pointing that there's one little arrow and that point is the midway is not correct. The midway is a substantial portion of the Florida State Fair. The A.J. released here... Is that where they were supposedly on the midway? Somewhere on the midway. But saying the midway is right there is not accurate. A.J. released here. That concerns me a little. It has two arrows. And then there's a red line drawn in that shows a fence. My concern is there's lots of fences that were involved here that are not disclosed and not discussed on this map. And I find that... How are we supposed to use this map since the court didn't have it? That's my objection. I don't... This is beyond the record is the problem. That's my objection. This map. Correct. So, with that being said, though, I would move on and let the court... It's already ruled and found this could be used. I was the one who issued the ruling as the chief of the panel. So Judge Choflat and Judge Pryor aren't to be saddled with my decision. The panel as a whole will decide afterwards what use, if any, we'll make of the demonstrative exhibit. Understood, Judge. So, now, very quickly, turning to the substantive issues. The court had asked some jurisdictional questions. Jurisdictional question number one, I would rely on our brief. That's pretty clear that FHP versus Jackson allows this issue to move forward. Jurisdictional number two, question number two, is about Article III standing. Certainly, I recognize this court's precedent suggests that Article III standing is not immediately appealable. But as Judge Jordan has discussed and Scott V. Taylor and other cases, standing is a fundamental basis for the court's jurisdiction. We're here today to talk about sovereign immunity and qualified immunity, and yet we have this doctrine of hypothetical jurisdiction in the way. And I would encourage this court to take this opportunity to join other courts, other circuits, and allow Article III standing to be appealed immediately. Because the remainder of my issues are about... Why should standing be... I'm going to argue against myself for a second. Why should standing be part of the Cohen collateral order doctrine? Well, I think the Supreme Court precedent is very clear that the Supreme Court disfavors rulings on the merits. We're going to be talking about the merits of sovereign immunity and qualified immunity. That's really the heart of this appeal from my client's case. And from our position, it just, to me, it suggests that it doesn't make sense to rule on sovereign immunity and qualified immunity with this Article III standing outstanding. Okay. And so I would encourage the court just to look at that again. I know, Judge Jordan, you have in the past. So as far as our arguments on count one, summary judgment for the sheriff was denied by the district court, as a matter of law, our position is that no duty was owed at the time the events, the relevant events happened in this case. No duty whatsoever? Well, there was a duty, I think, at certain points. But at some point after dropping A.J. off at 844 p.m. on February 7th, that duty either expires or evaporates because you can't have just perpetual duty. Was there a duty as to where to drop them off? I think that's a discretionary issue with the sheriff's office to determine that point of drop off. And that's what they did. That's a different question. Discretionary. Whether it's discretionary goes to whether there's ultimate liability, maybe. But was there a duty as to where they dropped them off once they had them in the van in their custody? Could they have dropped them off at the edge of I-4? Of course not. Of course. So there's a duty of some kind, right? Correct. The question is, and your contention is that whatever duty was owed was not breached here. Correct. And there's a number of factual issues talking about foreseeable zone of risk that I'd like to discuss. Talking about duty owed, first of all, Hillsborough County Sheriff's Office was clearly not the last step in the chain of causation of these events. Several steps, multiple steps removed. As I mentioned a minute ago, the drop off was an hour and 59 minutes before A.J. crossed and then re-crossed I-4 the second time is when he was struck. It was an hour and a half after A.J. consulted with a deputy and the deputy mentioned something about you have to get to where you want to go, it's across I-4. The facts are very clear. That happened an hour and a half before A.J. crossed and then re-crossed I-4. The distance of the location as shown on the other maps is quite a far range. You have to jump fences, which he did. You have to cross on Orient Road under I-4, which he did. There are multiple intervening events that come into play talking about last step in the chain of causation. Fifteen calls were made to and from A.J., none were made to his parents. He refused a ride. This was even after he was told that the only thing separating him from his destination was I-4. He did cross I-4 one time safely. He only re-crossed I-4 when he got a phone call and prompted by that phone call to cross I-4 again. Finding a duty on behalf of the Sheriff's Office would be inappropriate and my time has run. Can I ask you one question before you sit down? Do we have to evaluate whether or not there was a duty before we can evaluate sovereign immunity? Well, I think they interplay because the reality is, as a matter of law, was there a duty owed? And I think this Court should make a ruling on that as a matter of law. So looking at these factors, you really look at the case that is most apparent to us, Milanese v. Boca Raton, very similar factors and, in fact, I would suggest the factors in our case are more compelling that there was no duty owed. I do think that's part of the sovereign immunity analysis. Okay, I understand that if there was no duty owed, we don't need to get to the sovereign immunity analysis, but couldn't we look at the nature of the claims and the allegations to determine whether or not there was sovereign immunity? Well, I think the Court could, but ultimately, are you then blending into the discretionary v. operational function? Is that where the Court is going? I think, yes, and I think those issues to me, when you're talking about that, are the Sheriff's Office decision to choose the drop-off location, the Sheriff's Office decision to not provide supervision after the drop-off, the Sheriff's Office decision to eject A.J. v. arrest. All of those decisions are discretionary and all of those are the decisions that the District Court judge in her order criticized and, in our opinion, erroneously found to be operational v. discretionary. Thank you. So, yeah, that's an analysis this Court could make. Don't sit down yet. I have one more question for you, if I could. You say that there's no duties, but I want you to explain to me what there's no duty for. In other words, in a sentence, tell me how you would write the principle of law regarding duty in this case. There was no duty blank, fill in the blank, because you agree that at some point there is some duty to do something once they have the kids in their custody. There's no question that prior to 844, so from approximately 8 to 844, A.J. was detained. He was not free to leave. There would be, clearly, a duty of care right then. Right. So tell me how you would phrase the duty holding that you're asking us to come up with. I think our position is that given the passage of time and the intervening circumstances that the duty owed pursuant to the foreseeable zone of risk has expired. And you don't think that's a fact issue? I do not. I think that's a question for the Court as a matter of law. We understand you. Thank you. Okay. Thank you very much. Mr. Conahan. Good morning, Your Honors. If you may, please, the Court. Mr. Nolowitz. Your Honor, I am here, Sean Conahan, on behalf of the Florida State Fair Authority, one of the co-defendants in this matter. We are here subject to the jurisdiction of the Florida Highway Patrol v. Jackson case, also alleging that we have an affirmative defense of qualified immunity. That affirmative defense was brought before the District Court and was denied. You can't have qualified immunity, right? As an entity. You are absolutely correct, Your Honor. Sovereign immunity. Sovereign immunity. Right, right. My apologies. Got it. Got it. For the issue of sovereign immunity under the Florida Highway Patrol v. Jackson authority. And quickly, because I do not have enough time, we're alleging that we're entitled to sovereign immunity because the decisions, which we're allowed to make the planning level or discretionary decisions made by the Florida State Fair under the authority of Commercial turn over security for the fair to the Hillsborough County Sheriff's Office. And there's an analysis. So your argument is not based on the ultimate decision that was made by the powers that be as to where the drop-off was going to be. Your claim is that the discretionary decision was the fair's decision to turn all security-related matters over to the Hillsborough County Sheriff's Office. That is correct. It was a delegated duty, is your argument. Delegated. Yes, Your Honor. You agree it was a duty. There was some kind of duty. Well. Otherwise, you wouldn't have the Sheriff's Office there. Well, the statute that created the Florida State Fair authority, the only duty enumerated in that statute was we were responsible for. Now, what was the duty that you gave to the Sheriff? The duty that, if it was a duty, what we did was. Otherwise, the Sheriff is an interloper. He doesn't even belong there. The Sheriff's Office, Hillsborough County Sheriff. Other than to enforce the criminal law, of course. That's what they were provided, the duty to enforce criminal law and provide security for the fair. That's the only reason you let them be on the premises to enforce the criminal law of Florida. Is that your argument? No, Your Honor. They provided all security issues, including enforcement. They provided security. It was an obligation that the fair had. You agree? I do agree. Although, not in. And your argument is you were capable of delegating it. Absolutely. Suppose you couldn't delegate it, but in other words, you still had the obligation. I think I understand what the court is saying. Under the statute that created the Florida State Fair, our doctrine was staging an annual fair to serve the entire state. I agree with the court that it's implied in there that some type of security must be provided. In 1943, other than retaining the Pinkertons, the only other option, because there was not an industry of private security to the extent that there is today, was to go to the highest law enforcement officer of the county, in which the statute required us to put the fair on. The statute specifically said the fair would be put on in Hillsborough County. And go to the sheriff. And since 1943, the Hillsborough County Sheriff's Office has handled all security, planning, and law enforcement at the Florida State Fair. Your discretionary decision, as I understand what you're saying now, was the decision to hire the Hillsborough County Sheriff's Office and put them in charge of security. And then whatever else happened, they did, not you. Yes, Your Honor. And I'm out of time, if I may just quickly answer that. Sure. Unlike other authorities in the state of Florida, for example, an aviation authority that has an ability to create and run their own police force, Florida State Fair has that limited doctrine and limited resources. So yes, it was a planning level, discretionary decision to enter into the relationship agreement with the Hillsborough County Sheriff's Office to provide all aspects of security and law enforcement at the fair. May I ask another question? Of course. Your argument makes sense to me with respect to Count 3, but what about Count 2, vicarious liability? It seems to me that that count alleges that the sheriff's deputies were employees of the fair authority and that they took what seems to me to be operational decisions in their treatment of A.J. Clark. Understood, Your Honor. And again, what the record before the court shows that there was one deputy involved in this who was a correctional deputy, and that correctional deputy had no lawful authority to exercise police powers, did not have the authority to bear arms. And actually, the record shows that the corrections deputy involved merely provided transport under... You're talking about Clark? I'm talking about Deputy Jones, Your Honor. Okay. Deputy Jones was the transport deputy who was a correctional deputy, and the record shows that he only did the transport under the authority of a sworn law enforcement officer, as they are defined differently in Florida statute, who rode in the van with him, yet unidentified, yet unnamed. But that is the record before the court, and yes, we're saying that we are entitled to that the one employee, Deputy Jones, is responsible for it to the extent that it's determined that he was in the course and scope of some governmental action, if I answer that correctly. For the other deputies then, besides Jones, how were they related to the fair authority? Well, what the record shows is that over the years, Hillsborough County Sheriff's Office came and provided a plan, here's what you need, and here's how many deputies, and here's what it's going to cost you, but in addition to that, the sheriff would assign personnel during the fair as their normal responsible zone. For example, just using numbers, the fair might hire off-duty a thousand deputies for security at the fair, but the sheriff, in his discretion, would also send another thousand as their normal duties to provide law enforcement and security at the fair, depending on the numbers of patrons, etc. The record shows that all the deputies involved were, at that time, in their capacity as law enforcement deputies under the sheriff's office, and not those other than Deputy Jones in the off-duty capacity. Thank you. All right, thank you very much. How do I pronounce your last name? It's Anulowicz. Anulowicz, okay. Yes. Anulowicz. Yes, Your Honor. I have one that's a doozy, that's why I asked. May it please the Court. Andrew Joseph was a child. He was a 14-year-old eighth grader. He was an honor roll student at a Catholic high school in Tampa, Florida, middle school. He was supposed to have his first communion the day after this horrible but very preventable tragedy. The Florida State Fair invited Andrew and numerous other youths to its student day. At 6.30 p.m. on the night that he was invited… Were they explicitly invited, or was that just part of the visit of the fair? They were explicitly invited. All children within the county were invited to the fair. At 6.30 in the evening? He attended a private school, and so everybody in the county was invited. He attended a private school. Every other school was off that day, so he didn't get off until later, and then he went back home. But what I mean is, were they all invited to come at 6.30? Oh, no, no. They were invited the whole day. All day, including the evening? Yes, sir. And this was some sort of notice that was sent out? I think it's a program down there. It's a Florida State Fair event, the student's day, and it lasts all day. So just an event that was publicized? Yes, and they gave away free tickets to the students in the county. And when he was dropped off, he was dropped off at Gate 3 by Ms. Munn, and Gate 3 is at the bottom of the fair. He was supposed to be picked up there at 9.30. He went into the fair and went into the fair's midway grounds. At the midway grounds, there was allegedly a disturbance. The record shows that that disturbance was simply someone seeing a young man smoking a cigarette that they thought was a marijuana cigarette. Andrew, the Officer Clark, took a hold of somebody next to that man, slammed him, caused him bruising, injury, and his hat fell off. Andrew was his friend. He walked over, picked up this man's Florida State baseball cap and handed it back to this other young man. For that reason, for saying that he knew the other young man, RP, and for simply being in the area, he was taken into custody by Officer Clark. Just the two of them? He and the 12-year-old? No, there was a 12-year-old. There was other people that were also taken into custody. Many people were taken into custody that night. How many were taken in with him and the 12-year-old? I think at that time, it was probably like four or five. Four or five? Yes, but that was the event that had occurred right there. There were other events that occurred elsewhere in the night, and I think 99 people overall were taken into custody. But Andrew was taken into custody, and he was then moved from the Midway to the processing area. At the processing area, the evidence shows that he was photographed. He had a background check run. His parents were never called, and other evidence shows that he had to put up his shirt to show whether he had gang tattoos. He did not have a gang, and he was shackled at some point in time. He was then put into a van with no windows, driven outside of the fair. Where was the process place? Processing facility, and this is just a demonstrative, it's at the north center part of the fair. It's a booking and processing area. So he was brought up to the processing area, and that was an enclosed area. At all times, Andrew and these other people were surrounded by armed uniformed guards. Andrew was then put into a van, driven outside of the fair area, on the left side of the fair, outside of gate four. Outside the gate. Outside of the gate. Dropped outside. Dropped outside the gate in basically a triangle of danger. On the one side is the gate separating the ejectment area from the fair. Andrew says, can I walk back through the fair to get to gate three where I'm supposed to be picked up? Answer, no. You will be arrested if that happens. And the only thing separating you from where you need to be is I-4, the other leg of the triangle. I-4 is a six lane highway that's obviously a dangerous interstate. On the last leg of the triangle is Orient Road, which is a four lane road. Andrew's parents were not called. He was not released into their care, again as required by Florida law. Andrew makes his way up Orient Road to the other side of I-4 where the hotel is. He realizes, obviously, I'm in the wrong place. He makes the poor decision to run across the highway, gets hit, gets met by a gate and has to run back across the highway to try and get back to where he is. Andrew was dropped off without any instruction, without any guidance. He was simply left to fend for himself. Under Florida law, you can have a wrongful death claim if the defendants owe a statutory or common law duty that they breached. Here they did both. The defendants breached a statutory duty because under Florida Statute 985-1013, when a child is taken into custody, the officer shall attempt to notify the parent and shall continue such attempt until the parent is notified. So at the point of custody, the parent's supposed to be notified. That didn't happen. 985-1152A says that when a child is taken into custody, the officer shall attempt to release the child to the parents or to another responsible adult. I gather that's negligence per se under Florida law. It is a statutory duty that's created by law that the defendants breach in this case. Negligence per se. Yes. And under Florida Statute 985-0348, it defines the term taken into custody and it says the over the child is attained. Temporary physical control was attained as soon as Officer Clark said, you're coming with me. And it was maintained for 44 minutes until he was released. And at the point of his release, he was supposed to be released into the care of his custody. They breached that statutory duty. That answers the duty question. They also breached a common law duty. Under the common law, there are special tort duties that arise when an officer either takes someone into custody, detains them, or creates a zone of danger or subjects that person to danger. The defendant's argument that it's simply when they are in custody, that I heard when my friend was arguing up here, that's not the law. And that's Henderson, Pollack, and the Kinear case. And here, the defendants were under a heightened duty because Andrew was a child. And Florida statutes and Florida common law both say that you have to exercise more care when you're dealing with a child. One of the arguments on the other side is that whatever duty might have existed, sort of went away, evaporated, expired, whatever term you want to use, after a period of time when A.J. was dropped off outside of that gate. And so I'd like your response to that contention. My response is that that contention is not supported by Florida law. I think that the best case on that point is the Florida Supreme Court case in Henderson. In the Henderson case, an officer pulled over a car that had four drunk youths. And the officer arrested the driver and then put another intoxicated person into the driver's seat of the car, told that person to drive away and waited at a convenience store. They did that. They waited for the officer. The officer didn't come. They then drove away from there. There was a wreck that killed the two other passengers of the car. That Henderson case, again, Florida Supreme Court, the court decided that the officer, by setting into motion that type of danger, and it was foreseeable that that could happen, that that was sufficient to establish a duty under Florida law, even though the accident took place at a later point in time and further away from where the officer first encountered these people. And the case that they rely upon, the Milanese case, is really an opposite. In that case, there was a driver that was taken into custody, an adult driver, brought to a police station, and then he was released from the police station. And this is kind of the key, is the officer called a cab for that person. And for whatever reason, the person didn't get in a cab. He wandered away to a train track. Isn't your argument that it was just a fact issue? Well, the duty, yeah. Yes. If there's a duty, when it's released depends on the circumstances. Cause issue. I'm not making your argument, it's just a fact issue. The proximate cause issue is a fact issue. It's a fact issue. Yes. So the duty is a legal issue, the proximate cause, and whether or not the chain that took place afterwards is something that a jury can find, that is simply a jury question. But again, the Milanese case is very different, because there they called a cab, it was a divided Fourth Circuit, it's only been cited twice, never for the proposition that they cite. Henderson, my case, has been cited 87 times, including last year, by the same Fourth Circuit that discussed Milanese. Contrast to Milanese, they did not put Andrew into a cab, they didn't put him into a car with anybody else, they didn't call his parents. That is a violation of the clear statutory duty. On the sovereign immunity issue, to answer Judge Pryor's question, it's a two-part question. A, is there a duty, and then once you answer the duty, are they entitled to sovereign immunity? They are not entitled to sovereign immunity. Under Florida law, sovereign immunity is a separation of powers doctrine that only applies when the challenged action relates to legislative or executive functions on basic questions of policy and planning. Operational functions, which are not entitled to sovereign immunity, are simply a secondary decisions of how the policies are to be implemented. Wallace's case, the Kisner case, here no one's challenging a policy of the HCSO or the Florida State Fair here. Well, but your opponent says that it was a policy to delegate the duties of security and preventing crime to the Sheriff's Office. Well, I mean, A, there's an indemnity agreement that's cited in the record where the Florida State Fair says these are our employees and we're paying them, and that's cited by the District Court, and it is at HCO Appendix Volume 1 at 189 to 190. But the delegation, the record also shows that the Florida State Fair had an opportunity to participate in this. They admit that they employed Officer Jones and that by virtue of that indemnity agreement, they also employed these other officers, as did the Hilton County Sheriff's Office. Under Florida law, is the security of the fair a non-delegable duty? I don't, I think it is a delegable, I think it is. Is it, is it not? I think they're both responsible. Is it non-delegable? Is it, is, they're the property owner? Yeah, they're the property owner, and they, yes. I understand you have business invitees, and the question I have is, is the duty to the business invitees non-delegable? Is the duties non-delegable? Yes, I think it, yes. You know what I mean by non-delegable? Yes, I do. What do you think I mean? Yes, I think that means that they can't get out of it. And so they, they. Well, then it means the fair is still liable. They're still responsible. Yes. The sheriff becomes his agent. Exactly. Yes. We're saying the same thing. And here, the cases say over and over again that if you're simply an arrest, not the arrest itself, but the manner in which these things occur. Here, if it's just a trespass, they can say, Andrew, you need to leave. But they don't do that. They take him into custody, they move him to the processing area, they move him outside, they make these decisions. And the record also shows that the deputies were imbued with the discretion to and how to carry out these functions. And that's operational. Moving on to the qualifying. What about, though, for the direct claim against the, the direct claim against the fair? How is that operational? I think the operational part of the fair is, A, is that they, is that they employed Officer Jones as the responsible for that. And then they are also responsible for the other officers by virtue of the indemnity agreement. But the indemnity agreement doesn't give rise to a duty, right? It says that they're, they're his employees. Yes, which might matter for ultimate liability, but it doesn't speak to the question of immunity or duty. Well, it doesn't. I mean, I think it's the, they are going to be responsible for the operational functions of these officers, including Jones, Clark, and the other officers there. And I may be missing something. Right. But that's the vicarious liability claim. Right. What about count three, the direct liability claim? That, yeah. For that claim, I still think that the, that they are, I mean, it's the same, I mean, it's essentially the same claim. They are only responsible because of the actions of their, of their, of their employees. So that, I think that's the, that's the only claim. What is the entity status of the fair? The legal entity status? I think it's the Florida State Fair Association. Is it, what, is it a, is it a corporation? It's a statutorily created Florida corporation. I think it's a... A statutory creation? Yes. It's a statutory creation. I believe. If I've got that wrong, I'll correct it later. But I believe it's a statutory creation. And on the qualified immunity claim, they were, the issue here is whether or not Andrew was taken into custody without a warrant and without probable cause. And we believe that the answer to that question is yet. At the trial court level, they argue that this was a, that this was a Terry stop. They've abandoned that argument on appeal. They now say, well, it wasn't a Terry stop. He wasn't under arrest. Well, it took, it was too long for a Terry stop. Too long for a Terry stop. It's also, he was moved twice. He was moved to the processing area. He was moved out of the, he was moved out of the fairgrounds. And the case law says that when that occurs and it's involuntary as it was here, that that moves from a Terry stop to a de facto arrest. Is the stop and detention a separate claim of yours or it's all wrapped up in the wrongful death claim? They're two separate claims. There's a 1983 wrongful search and seizure claim that's brought just against Officer Clark in his individual capacity. And so in that capacity, we are saying that he unlawfully took Andrew into custody and that he had no probable cause. The only probable cause, the only cause that he had was that Andrew was next to RP and was next to these other people and that he was near the area of the disturbance. And under the, under the case law, it's Swint, Coffin, Holmes, Yabra, and U.S. v. Affendor, the courts consistently say that propoquinity, proximity next to somebody is not sufficient to, to be probable cause and simply being in an area of a disturbance is not sufficient to have probable cause. He was certainly detained, he was certainly arrested, and they did not have probable cause so the, so the 1983 case against Clark should be affirmed. Thank you. All right. Thank you very much. Appreciate it. Mr. Brown. Thank you, Judge. I, too, would like to address the qualified immunity, but I'd have to not address. So we've talked about Keisner v. Kolb, we've talked about Henderson v. Bowman, and I would just suggest this Court look at those a little more carefully than has been, what has been portrayed here today. Specifically, in Henderson v. Bowman, the law enforcement officer directed an intoxicated person to drive. That, that's so far different from the facts here where we have an hour and 59 minutes delay between law enforcement custody and I-4 and so many intervening circumstances that that duty, that foreseeable zone of risk. All right. Let's explore that for a minute. If you had an 8-year-old child who had been dropped off on student day by a parent without any adult supervision and that child had been taken into custody under, or detention under similar circumstances, and that child gets dropped off in the same place that this child was dropped off, there's no duty? Well, I think that the key phrase, what you're saying there, is custody. Because from our position... Okay, I don't want to get caught in labels. The same thing that happened here happens to my hypothetical 8-year-old child. Is there any duty? It is a substantive due process obligation. Our position is... It's just, it's like a pretrial detainee. There's no... He's detained. He is detained. They're dropped off. That's a, that triggers a substantive due process right when he was detained. Correct. Okay. I would agree with that. My problem is, is when that obligation or the right, let's put it that way, expires as a fact issue, is it not? When that... I believe that's a... I would argue that's a matter of law. Your argument has to be that it's all over at some point in time. The issue is, with law enforcement, you have the public duty doctrine that has to be counted for. Now, let's assume that you're like a hospital, a state hospital or a prison or something like that when I'm talking about substantive due process. Understood. He's been committed. Yes. He's been committed to the sheriff's custody. Okay. So, doesn't that become a fact issue when the obligations that the Constitution puts on the sheriff expire? Our position is those obligations predicated on 995 did not get implicated in this case. Let me give you a hypothetical in another setting. Let's suppose that the sheriff is running a mental hospital, mental hospital, and the child is committed to the hospital. Okay. Will you agree that substantive due process protects the child from unusual dangers? I would agree that a duty has been created and 985 has been implicated. Would you agree that that's a substantive due process right? Yes. Okay. Now, let's suppose the mental hospital, this is hypothetical, discharges somebody who is not capable of functioning. You follow me? I do. Okay. Does the substantive due process right or obligation cease at that point in time? I think the Florida courts have said it does. No, no, no. That's Millennials. No, not Florida courts. Federal substantive due process obligation. The state hospital has an obligation toward the patient. Do you understand me? Yes. Okay. Stick with this hypothetical. The patient is now released from custody as it were and can't function and walks across the street and is hit by a car, all right? Has the substantive due process obligation, the duty owed by the Constitution to the patient ceased? It has. Okay. When the patient goes out the door? Well, maybe not in every case, but I think that's an argument that can be made. And where is my hypothetical? When does it cease? Well, if you look at the Millennials case, it does cease when they left, when they walked out the door. That's right. But they had taken them in custody knowing about the mental illness, let's say. Just like in Milanese, the person was impaired. He was intoxicated. So once the door was opened and they left, the duty... I understand your argument. Okay. If I might have just a minute or two to address qualified immunity. You've got a minute. Okay. Thank you. So at any rate, our issues on that, that are argued in the brief, that summary judgment should have been granted on that. There was no constitutional violation. The facts that have been portrayed here today are a little different than the facts that are undisputed. A.J., the facts are undisputed. He ran after this crowd. There's multiple depositioned opponents that said that. So he ran after the crowd? Ran after the grouping of deputies and detained individuals. And then there's another deponent that said he ran to pick up the hat. Well any act... Running to pick up a hat is not improper conduct. We're talking about arguable probable cause under Florida statute. In the light most favorable to the non-moving party. Right? The statute, sure. But in the statute here, 616.185, where there is zero case law in the state of Florida, there are zero jury instructions about that. It says, any act that disrupts the orderly conduct of the fair or the public. We have deponent's testimony saying running through the midway could have satisfied that. My position, and I think it's supported by the... You can detain any child that runs through the midway at the Florida State Fair. That could be a violation of... That would be a remarkable proposition to tell Florida police officers, that you can take a child, not just stop them and say, don't run, that's not a good thing, but you can take a child, stick them in a van, and take them to a processing center for running on the midway. You say that a Florida law enforcement officer would objectively think that he has the right to do that. That's not my argument. Because that's not what... Then I misunderstand it. That's not what Deputy Clark said. That's what two deputies say, and the only way we know what Deputy Clark said is through a different deputy who said that he said, Deputy Clark, AJ was running through the midway causing disorderly conduct. You're telling me there was no contrary evidence about what AJ was doing at that time? We have, he was running. We have, he was running to pick up the hat, and then he was running through the midway causing disorderly conduct. Who testified on his behalf through affidavit or depositions about what he did or didn't do? What Deputy Clark did? No, what AJ did. So we have JP, I'm using the initials, testified that AJ started running after the group of what she testified to. We have CT who said he testified that he ran to pick up the hat. And then we have Deputy Escheniche who said that Deputy Clark told him AJ was running through the midway causing disorderly conduct. My simple argument on that is, under those facts, that's arguable problems. Counsel, we're on summary judgment. And when we're talking about qualified immunity, you lean all the facts in favor of the non-movement. Understood. We understand. You're making a summary judgment argument. And all I'm saying is, it's my position that the facts supported granting of that summary judgment. We understand your position. If there's no other questions, thank you. Thank you very much, Mr. Brown. Okay, Mr. Conahan. Yes, Your Honor. If it may please the Court, I have one minute. Your Honor, to address the question that you had for Mr. Nulowitz. The Florida State Fair Authority is a public entity created by Section 616.251 Florida Statutes. And there was some discussion as to whether or not there was an indemnity agreement. I haven't looked at it today. I am familiar with it. That is an indemnity agreement that is created out of statute. There's a Florida chapter that discusses the duties and responsibilities of the Florida Sheriff. And there is a section in there that requires, for off-duty employment, the agreement that must be what is contained in there. And that agreement is one that the Sheriff's Office uses in all off-duty employment. What difference does that make, counsel? Because it doesn't make the... What difference really does it make? It doesn't make the deputies, Your Honor... In terms of the Constitution of the United States, it doesn't mean anything, does it? Correct. In terms of the Constitution. Yes. In terms of constitutional rights and the common law on obligations owed business entities, it doesn't matter, does it? Well, in this particular matter, it does, Your Honor, because it doesn't necessarily make the deputies agents of the fair when they are performing a law enforcement function. That's a... Well, that's a fact issue. It's a fact issue of what they were doing. Your label is that it belonged to the Sheriff and it's a law function, like arrest and so forth. But no, that's a fact issue, is it not? Correct. As to whether or not Deputy Jones was an agent... And they could have been leaving their responsibility as a law officer under the law. All of that's a fact issue, isn't it? To an extent, but I think it's a legal issue... Well, let's put it this way. On the facts, a jury could find that they just happened to be there and they were agents of the fair. And the fact they were employees of the Sheriff's Office and had an oath or this, that, the other thing, wouldn't matter, would it? As a fact issue. As a fact issue, Your Honor, but as a legal issue... Well, that's my problem is we're on summary judgment here. Correct, Your Honor, but as a legal argument as to whether or not they were agents as brought up by opposing counsel, I merely explain the language of the indemnity agreement and why it's inapplicable to defeat sovereign immunity in this particular matter. All right, Mr. Conahan, thank you very much. We thank all of you very, very much for your help. We're in recess until tomorrow morning.